UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Deborah Parker

     v.                                    Civil No. 13-cv-053-JL
                                              Opinion No. 2014 DNH 237

Accellent, Inc.
and Portlyn LLC

**MEMORANDUM ORDER**

This case might be called "Who moved my table?" in homage to the popular self-help book Who Moved My Cheese?, a parable about characters who struggle to survive in the maze where they live after suddenly discovering that the cheese on which they have come to rely is missing from its usual place.[1]  The events giving rise to this case began when the plaintiff's employers, manufacturing companies known as Accellent, Inc. and Portlyn, LLC,[2] removed an adjustable table from her work station and replaced it with a stationary one.

The plaintiff, Deborah Parker, claims that she needed the adjustable table as an accommodation for her fibromyalgia and, after she discovered the table had been replaced, complained to her supervisor and her foreman--cursing in response to her

---

[1]Spencer Johnson, Who Moved My Cheese? 25-34 (2002).

[2]Since it makes no difference to the analysis here, the court will collectively refer to the defendants as "Accellent."

foreman's directive that she get back to work.  One week later,
Accellent proposed transferring Parker to a different
manufacturing line where all of the tables were adjustable, but
Parker returned to work at the stationary table for two more days
and then, after taking a brief period of approved leave, quit.

Parker has since brought claims against Accellent for:

(A) discriminating against her due to her disability in
violation of the Americans with Disabilities Act
("ADA"), 42 U.S.C. § 12112(a), and its state-law
analog, N.H. Rev. Stat. Ann. §§ 354-A:7, I, VII(a), by

(1) subjecting her to a hostile work environment
due to her fibromyalgia,

(2) failing to accommodate that alleged
disability, and

(3) constructively discharging her;

(B) retaliating against her because she requested a
reasonable accommodation, in further violation of the
ADA, 42 U.S.C. § 12203(a), and state law, N.H. Rev.
Stat. Ann. § 354-A:19, and

(C) also retaliating against her because she had taken
leave under the Family and Medical Leave Act ("FMLA"),
29 U.S.C. § 2615(a)(1).

This court has jurisdiction under 28 U.S.C. §§ 1331 (federal
question) and 1367 (supplemental jurisdiction).

Accellent has moved for summary judgment.  See Fed. R. Civ.
P. 56.  Accellent argues, among other things, that there is no
genuine dispute that

(A) it did not discriminate against Parker on account
of her disability because

2

(1) any disability-based harassment never reached the level of an actionable hostile environment,

(2) Accellent proposed a reasonable accommodation for Parker's claimed disability as soon as the company learned of it, and

(3) as a result, Accellent did not subject her to a constructive discharge; and

(B)-(C) Accellent's allegedly retaliatory acts were not motivated by her disability or her exercise of her FMLA rights.

The court agrees.  Taking the admissible evidence of record in the light most favorable to Parker, the earliest Accellent knew she needed an adjustable table as an accommodation for her fibromyalgia was the day they removed the adjustable table--and, within a week, Accellent had proposed transferring her to a different manufacturing line, where all of the work tables were adjustable.  After Parker nevertheless continued working on the same manufacturing line for two more days, she availed herself of a brief period of FMLA leave, then, after ignoring Accellent's invitation to formally request an accommodation, announced she was quitting.  Based on these undisputed facts, no rational jury could find that Accellent discriminated against Parker due to her claimed disability, including by failing to reasonably accommodate it.  Nor could a rational jury find that Accellent retaliated against Parker for requesting the accommodation, or for taking FMLA leave.  Following oral argument, then, the court

3

grants Accellent's motion for summary judgment, for the reasons detailed below.

## I.   **Applicable legal standard**

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute is "genuine" if it could reasonably be resolved in either party's favor at trial by a rational fact-finder, and "material" if it could sway the outcome under applicable law.  See Estrada v. Rhode Island, 594 F.3d 56, 62 (1st Cir. 2010).  In deciding summary judgment, the court "views all facts and draws all reasonable inferences in the light most favorable to the non-moving" party.  Id.  The following background facts are set forth in accordance with that standard.[3]

---

[3]Accellent faults Parker for her response to their statement of material facts, arguing that, because its format and substance "leave it unclear as to whether [she] disputes" Accellent's stated facts, the court should deem all of those facts admitted under L.R. 56.1(b).  As this court has explained, though, this rule "does not envision the non-movant's version of facts as a response to the movant's version; the rule requires only that the opposition memorandum 'incorporate a short and concise statement of material facts, supported by appropriate record citations, as to which the adverse party contends a genuine dispute exists so as to require a trial.'"  Grivois v. Wentworth-Douglass Hosp., 2014 DNH 017, 5 n.1 (quoting former L.R. 7.1(b)(2)).  Despite its unorthodoxies, Parker's factual statement complies with this rule, so the court has considered her stated facts in its ruling, insofar as they are supported by admissible evidence of record.

## II.  **Background**

In 1995, Parker began working Accellent, which manufactures medical devices at a facility in Laconia, in the Lakes Region of New Hampshire.  The facility operates in a "cellular manufacturing" environment, where each "cell" is dedicated to the manufacture of a particular product assembled as it moves through different stations along a production line.  While Parker briefly held a supervisory role as a "cell coordinator," she spent most of her career with Accellent as an assembler, working at different stations within the so-called "flexible" line, and also, from time to time, on the "speciality" and "rigid" lines.

In 1997, Parker notified Accellent that she had fibromyalgia, a condition marked by overall pain and fatigue throughout the body.  More than a decade later, in March 2008, Parker sought FMLA leave as a result of her fibromyalgia, presenting a form from her health care provider noting that episodes of incapacitation were likely to occur between 1 and 3 days every month, and that Parker might "not be able to stand [or] extend [her] head for a regular work day on some days due to pain and fatigue."  Between then and 2011, Parker took "a handful of days" of FMLA leave each year for her fibromyalgia, she recalls, but she has not identified the dates of that leave any more specifically, by resort to her time records or otherwise.

5

From early February through early April 2011, Parker accepted a voluntary furlough from Accellent so that she could care for her adult daughter, who had cancer.  (Accellent had offered FMLA leave to Parker for this purpose, but she declined.) Parker attests that, when she returned to the workplace, "harassment" at the hands of her foreman, Linda Edmonds, "increased."  This alleged harassment took the form of a statement to Parker in April 2011 that Parker "had no right to make decisions [on her line] because [she was] out all the time, [she was] not there enough, [she was] out sick a lot."  Edmonds also told Parker that she was "too slow" and "need[ed] to speed [her work] up."

On Monday, June 6, 2011, Parker arrived at work from another voluntary furlough to find maintenance workers setting up a stationary table at her work station, replacing the adjustable hydraulic table that had been there previously.  (The height of the adjustable table could be changed by pushing a button.)  When Parker asked them if they could return the adjustable table, the workers explained that they were acting at the direction of Parker's supervisor, Larry Weber.

Parker then called Weber.  Despite some equivocation at her deposition as to the substance of this conversation, Parker states in her affidavit in response to the summary judgment

motion that she "asked why he took [her] hydraulic table after the conversations [she] had with him about it being an accommodation for [her] fibromyalgia and that [she did] adjust it during the day," and that Weber said that he "had forgotten about that" but "would talk to [] Edmonds and get back to" Parker.[4]

After not hearing from Weber for about half an hour, Parker approached Edmonds and asked her to arrange for the return of the adjustable table, "reminding her that [Parker] needed it as an accommodation for [her] fibromyalgia," as she says in her affidavit.  Edmonds "screamed at [Parker] to get [her] butt back to work, that the tables were not going to be changed and that [she] needed to get used to it."  Parker acknowledged that, after she returned to her work station, she said, in the presence of several of her co-workers, "this is bullshit," and also "probably said [] the 'F' word a few times."  After a co-worker announced

_____

[4]Asked at her deposition whether, during this conversation, she had mentioned her fibromyalgia, Parker responded that she had "mentioned it.  They all knew.  It's in the records.  [Weber] had been there long enough that [he and Parker] had discussed it at length, [her] daughter's illness, [her] four herniated discs." Asked whether, because "these were all things that people knew already," she "didn't feel it necessary to mention it [*sic*] again," Parker responded that she "probably did," then that was "sure [she] did," then, finally, that she was "not sure."  Taking the record in the light most favorable to Parker, however, this court has adopted the version of the conversation set forth in her affidavit.

that she was "sick of hearing about the table," Parker also
uttered what she has described as "a few choice words."

Later that day, Parker submitted a handwritten "formal
complaint" to "Accellent Management" as a "last attempt to get an
ongoing issue resolved."  The issue, according to the complaint,
was that Parker "and many of the ladies on the flexible line have
been constantly belittled and spoken to in a harassing and
vicious manner by Linda Edmonds," though the complaint does not
attribute any disability-based animus to this harassment.  The
complaint also states that Parker's "not being on the line for
awhile . . . because of a very sick daughter[,] and [having] that
thrown in my face[,] was the lowest blow."  Parker's complaint
does not, however, mention any harassment for being out sick--nor
does it mention the adjustable table, whether as an accommodation
for her fibromyalgia or otherwise.

Parker worked at the stationary table throughout that day,
as well as the next day, Tuesday, June 7.  But, she says, this
caused her "[f]ibromyalgia and back/neck problems to flare up
with increasing pain," so she took the rest of the week off as
FMLA leave.  When Parker returned to work the following Monday,
June 13, she was summoned to a meeting with Weber and Mary
Morris, where she received a "corrective performance review."
This review criticized Parker for much of her behavior of June 6,

including repeatedly leaving her work station, and yelling and swearing, to object to the removal of the adjustable table.[5]  The review advised Parker that, while she "must accept the decisions made by management," she could question a decision by "providing additional information or opinion no more than twice to any one individual" and "bringing her concerns to the next person up in the chain of command if and when she has further questions about the decision made."

Parker says that, at this meeting, she "again told [] Morris and [] Weber that [Parker] needed the adjustable table as an accommodation for [her] physical conditions" and "reminded [Weber] that [he and Parker] had discussed it a year ago when [she] informed him that [she] needed it for fibromyalgia and four herniated disks."  In response, Weber said he could not remember any such prior conversation, while Morris asked Parker why she had not told them that previously.

In any event, at the June 13 meeting, Weber and Morris offered to have Accellent's engineering department "help and go out and see what [Parker's] problems were and . . . study it and see what was needed."  Weber and Morris also, as Parker

---

[5]The review also charged that Parker had "removed company property without authorization," specifically, a production log containing "proprietary information."  At the June 13 meeting, Morris claimed she had seen Parker removing from the log from its proper place.  Parker says that this accusation is false.

acknowledged in her deposition, "offered [her] a transfer to the
rigid cell," where all of the tables were adjustable, though that
"wasn't a definite thing, it was a possibility."  But Weber and
Morris refused to return the adjustable table that Parker had
been using on the flexible manufacturing line.  Following the
meeting, Weber told Edmonds that Parker "had stated that she
needed an adjustable table for her fibromyalgia," and discussed
"mov[ing] [Parker] to another work station and whatever [Edmonds]
needed to do . . . to immediately help her and get her off that
work station" with the stationary table.  Edmonds then asked
Parker to move to a different work station, but Parker objected.

So, for the remainder of June 13, and the next day, June 14,
Parker worked at the stationary table on the manufacturing line,
which, she says, caused her "increasing pain" that she attributes
to her fibromyalgia.  On June 15, Parker called in sick, marking
the beginning of a period of FMLA leave.  One week later, on June
23, Morris sent Parker a letter asking her to provide updated
medical documentation of the condition necessitating her FMLA
leave, and noting that, if Parker did not require FMLA leave but
nevertheless believed that "the limitations of [her] condition
interfere[d] with [her] ability to perform the essential
functions of [her] job," she could "request a reasonable
accommodation."  The letter further invited Parker to "discuss

accommodations" by calling Morris or by submitting Accellent's "Request for Reasonable Accommodation" form, which was attached (and which Parker had never previously submitted).

While Parker acknowledges her receipt of this June 23 letter, she did not respond to it, either by recertifying her need for FMLA leave or by requesting a reasonable accommodation. Instead, Parker recalls, "[o]n or about July 10, 2011, [she] realized that [she] could not return to work on a non-adjustable table, and was certain that [Accellent] would not return [her] adjustable table, as this request had been denied on multiple occasions"--so she notified Accellent of her resignation.

Parker later applied for unemployment benefits.  Accellent opposed Parker's claim, stating that, among other things, Parker had received a formal warning for, among other things, "remov[ing] company information from property [*sic*] [without] authorization"--which was indeed one of the allegations set forth in the performance review presented to Parker on June 13.  <u>See</u> note 5, <u>supra</u>.  This statement was contained in an October 24, 2011, e-mail Morris sent in response to a New Hampshire Employment Security ("NHES") official, who had asked Morris to "provide a rebuttal" to a statement submitted by Parker (Parker's prior statement to NHES is not in the summary judgment record). Ultimately, Parker's claim for unemployment benefits was granted.

11

She later brought this action in Belknap County Superior Court against Accellent, which duly removed it here.  28 U.S.C. § 1441.

## III. <u>**Analysis**</u>

As noted at the outset, Parker has brought claims against Accellent for:

> (A) discriminating against her due to her disability in violation of the ADA and and its state-law analog by
>
>> (1) subjecting her to a hostile work environment due to her fibromyalgia,
>>
>> (2) failing to reasonably accommodate that alleged disability, and
>>
>> (3) constructively discharging her due to that alleged disability;
>
> (B) retaliating against her because she complained about that discrimination, in further violation of the ADA and state law; and
>
> (C) also retaliating against her because she had taken leave under the FMLA.

Accellent has moved for summary judgment on all of Parker's claims.  For the reasons explained below, the motion is granted in its entirety.

### A.   **Disability discrimination**

#### 1.   **Hostile environment**

In relevant part, the ADA prohibits "discriminat[ion] against a qualified individual on the basis of disability in

12

regard to . . . terms, conditions, and privileges of employment."
42 U.S.C. 12112(a).  New Hampshire law likewise forbids an
employer, "because of the . . . physical or mental disability
. . . of any individual," to "discriminate against such
individual . . . in terms, conditions or privileges of
employment."  N.H. Rev. Stat. Ann. § 354:A-7, I.  The parties
assume, for present purposes, that these prohibitions reach
disability-based harassment in the workplace, so the court will
make the same assumption.  See Quiles-Quiles v. Henderson, 439
F.3d 1, 4 n.1 (1st Cir. 2006) ("Although we have not had occasion
to evaluate disability harassment as a viable theory of recovery,
we have assumed that it is viable."); cf. Madeja v. MPB Corp.,
149 N.H. 371, 378 (2003) (relying on cases interpreting federal
employment discrimination law to aid interpretation of N.H. Rev.
Stat. Ann. § 354-A).

To prevail on a claim of disability-based workplace
harassment, Parker must prove that (1) she has a disability,
(2) she was subjected to a hostile environment, and (3) the
hostility was directed at her because of her disability.
Quiles-Quiles, 439 F.3d at 5.  In moving for summary judgment,
Accellent argues that Parker lacks evidence for a rational jury
to find in her favor on any of these elements.  Because the court
agrees that no rational jury could find that the alleged

13

harassment, to the extent it was based on Parker's claimed disability, rose to the level of a hostile environment, the court need not and does not decide whether a rational jury could find that she was disabled in the first place (instead, for purposes of this order, the court has simply assumed Parker is disabled).

The record, taken in the light most favorable to Parker, shows that, starting in April 2011, Edmonds "ma[de] comments [to Parker] like, 'You're too slow' or 'You need to speed it up.'"[6] But these comments, on their face, were merely criticisms of Parker's work performance--none of them referred to her claimed disability, even obliquely.  Nor is there any evidence that Edmonds singled Parker out for this kind of criticism based on her claimed disability--to the contrary, when she filed her complaint, Parker alleged that not just she, but "many of the ladies on the flexible line" had been "spoken to in a harassing and vicious manner" by Edmonds.  On this record, no rational jury could find that Edmonds subjected Parker to this criticism based

---

[6]Parker seems to suggest that because, on her version of events, "harassment by Ms. Edmonds increased" after Parker returned from her voluntary furlough in April 2011, a jury could find a link between the alleged harassment and her claimed disability.  But Parker took that furlough to care for her ailing daughter, not because of her disability, and there is no evidence that Edmonds mistakenly believed that Parker had actually been absent due to her own medical condition.  So the timing of the alleged harassment vis-a-vis the furlough does not rationally suggest a disability-based animus.

on her disability.  See Joens v. John Morrell & Co., 354 F.3d 938, 941-42 (8th Cir. 2004) (affirming entry of summary judgment against hostile environment claim arising out of foreman's criticizing plaintiff's performance, given the "neutral nature of [foreman's] complaints" and lack of evidence that foreman treated plaintiff differently from other employees).

Parker also relies on Edmonds's statement that Parker "had no right to make decisions in flexible cell because [she was] out all the time, [she was] not there enough, [she] was out sick a lot," as well as the incident of June 6, when, after Parker "remind[ed] [Edmonds] that [Parker] needed [the adjustable table] as an accommodation for [her] fibromyalgia," Edmonds "screamed at [Parker] to 'get [her] butt back to work, that the tables were not going to be changed and that [she] needed to get used to it.'" Even assuming that a jury could find that this behavior was motivated by Parker's disability, these two incidents are manifestly insufficient to establish a hostile environment claim.

To prevail on such a claim, a plaintiff must "show that his 'workplace [was] permeated with discriminatory intimidation, ridicule, and insult that [was] sufficiently severe or pervasive to alter the conditions of . . . [his] employment and create an abusive working environment.'" Quiles-Quiles, 439 F.3d at 7 (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)).

Two comments from a supervisor, even if one of them was screamed, do not meet this standard.  See Pomales v. Celulares Telefonica, Inc., 447 F.3d 79, 83-84 (1st Cir. 2006).  The court grants Accellent's motion for summary judgment on Parker's hostile environment claims.

### 2.   Failure to accommodate

Another form of job discrimination banned by the ADA and its state-law analog is "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability."  42 U.S.C. § 12112(b)(5)(A); see also N.H. Rev. Stat. Ann. § 354-A:7, VII(a) (same).[7]  But, as the Court of Appeals has held, "[t]he obligation is on the employee to provide sufficient information to put the employer on notice of the need for accommodation," including "not only notice of a condition, but of a 'causal connection between the major life activity that is limited and the accommodation sought.'"  Jones v. Nationwide Life Ins. Co., 696 F.3d 78, 89 (1st Cir. 2012) (quoting Barbara Lindemann & Paul Grossman, Employment

_____

[7]Given the nearly identical wording of the federal and state statutory requirements for reasonable accommodation in the workplace, and the paucity of New Hampshire case law applying N.H. Rev. Stat. Ann. § 354-A:7, VII(a), this court has relied exclusively on federal case law in considering Parker's reasonable accommodation claims.  See Madeja, 149 N.H. at 378.

Discrimination Law ch. 13.VI.D.1, at 880 (4th ed. 2007)).  As a
result, "the ADA's reasonable accommodation requirement usually
does not apply unless triggered by a request from the employee."
Reed v. LePage Bakeries, Inc., 244 F.3d 254, 261 (1st Cir. 2001)
(quotation marks omitted).

Accellent argues that there is no trialworthy issue as to
whether, after receiving notice of Parker's claimed disability,
it promptly proposed a reasonable accommodation, namely,
transferring her to the rigid manufacturing line, where all of
the tables were adjustable.  But Parker argues that facts remain
in dispute both as to when she first put Accellent on notice of
her need for a workplace accommodation and as to whether Weber
and Morris offered one after, in her telling, she "reminded" them
of her need for an accommodation at the June 13 meeting.  As
explained in detail below, Parker has not come forward with
admissible evidence to dispute any fact material to either of
these issues, with the result that summary judgment must enter
for Accellent on her claims that it failed to accommodate her
alleged disability.

Parker asserts that, prior to the June 13 meeting with Weber
and Morris, she had "repeatedly informed [Accellent] (including
[her] supervisors) she needed the table for her . . . qualified
disability, and they had known for more than a year"

17

(parenthetical omitted).  But Parker's only record support for
this assertion is her affidavit's account of the June 13 meeting
where, she attests, she "reminded [] Weber that we had discussed
it a year ago when I informed him I needed [the adjustable table]
as an accommodation for my fibromyalgia and four herniated
disks."  A witness's testimony about her own out-of-court
statement "reminding" another person about a prior event is not
admissible to show that the prior event in fact occurred.  See
Fed. R. Evid. 801(c); United States v. Check, 582 F.2d 668, 680-
81 (2d Cir. 1978) ("a witness's prior statements offered to prove
the truth of the matters asserted therein are not immunized from
the proscriptive effect of the hearsay rule") (footnote
discussing inapplicable exceptions omitted).  For reasons that
are unclear, Parker's affidavit offers no independent account of
the alleged occasion, one year prior to the June 13 meeting, when
she informed Weber that she needed the adjustable table as an
accommodation for her claimed disability, nor does she identify
any such evidence elsewhere in the record.

Parker's affidavit further attests that, during the June 6
exchange with Weber that followed the removal of the adjustable
table, she "asked why he took my hydraulic table after the
conversations I had with him about it being an accommodation for
my fibromyalgia" (capitalization omitted).  Insofar as this

testimony is offered to show that, in fact, Parker and Weber had
previously discussed the adjustable table as an accommodation for
her fibromyalgia, it presents the same problem as Parker's
testimony as to "reminding" Weber of those prior discussions
during the June 13 meeting.  And insofar as Parker offers her
testimony as to the June 6 exchange to show that she had first
requested an adjustable table as accommodation for her claimed
disability by that point--as opposed to June 13, as Accellent
asserts--this dispute is ultimately immaterial to the fate of
Parker's reasonable accommodation claim.

By Parker's own account, Weber responded to her telling him,
on June 6, that the adjustable table had been an accommodation
for her fibromyalgia by saying "he had forgotten about that, but
would talk to Ms. Edmonds and get back to me."  Just one week
later, on June 13, Weber and Morris informed Parker that they
would not be returning the adjustable table, but offered that the
company's engineers could work with Parker on an alternative
solution, and that they also could transfer her to the rigid
manufacturing line, where all of the tables were adjustable.

While Parker states in her affidavit that Morris did not in
fact "offer [her] a position on the rigid line at this time," she
testified at her deposition that, during the June 13 meeting,
Accellent "had offered [her] a transfer to the rigid cell . . . .

19

That's was what they had said to [her], that there was a
possibility that [she might] be transferred to the rigid
cell"--though, she later elaborated, "[t]hey didn't know when it
would take place or if it would take place."  As a result, Parker
asserts in her briefing, she "did not consider this as an offer."
Putting aside the fact that, as just noted, Parker agreed in her
deposition testimony that Accellent had "offer[ed] [her] a
position on the rigid line," whether she subjectively viewed her
employer's raising the possibility of that transfer as an "offer"
is immaterial.  Cf. Bellino v. Peters, 530 F.3d 543, 550 (7th
Cir. 2008) (ruling that no genuine issue existed as to whether
employer offered plaintiff an accommodation despite his attempt
to characterize employer's proposal as a refusal to accommodate).

It is undisputed that, during the June 13 meeting, Weber and
Morris at the least mentioned transferring Parker to the rigid
line, where all of the tables were adjustable, as a potential
accommodation for Parker's claimed need for such a table (in
addition to proposing that Accellent's engineers work with Parker
on a different solution).  It is likewise undisputed that,
despite Weber's instructions to Edmonds "to immediately help
[Parker] and get her off that work station" with the stationary
table, Parker objected to Edmonds's order to move to a different
work station, returning to the stationary table instead.

20

Finally, it is undisputed that, after working at the stationary table for one more day, Parker never returned to Accellent, taking a period of FMLA leave and then quitting--without responding in any way to Morris's written offer, sent just 10 days after the June 13 meeting, to fill out the company's workplace accommodation request form.[8]

In short, then, Accellent learned that Parker's condition allegedly necessitated an adjustable work table on (at the earliest) June 6, 2011, and by June 13, 2011 had suggested getting her such a table, either by transferring her to a different production line or moving her to a different work station.  Rather than pursuing either of these options, Parker returned to work at the stationary table for less than two days, then quit because, as she puts it in her affidavit, "I was certain that they would not return my table as the request had been denied multiple times."  But, as Accellent points out, "an

---

[8]Despite these undisputed facts, Parker asserts that Accellent "did not participate in the interactive process."  It is true that "[o]nce the employer becomes aware of the disability of an employee, [the] employer is expected to engage in a meaningful dialogue with the employee to find the best means of accommodating that disability."  Tobin v. Liberty Mut. Ins. Co., 433 F.3d 100, 108 (1st Cir. 2005).  Based on the undisputed facts just discussed, no rational jury could find that Accellent failed to do that here.  See id.; Enica, 544 F.3d at 339 ("an employer will not be held liable if it makes reasonable efforts both to communicate with the employee and provide accommodations based on the information it possessed") (quotation marks omitted).

employer is [not] required to provide an employee with an accommodation of her choice." Enica v. Principi, 544 F.3d 328, 342 (1st Cir. 2008).

To the contrary, "[i]f more than one effective reasonable accommodation is available, the employer may choose among them, and is not required to provide the employee's preferred accommodation." I Barbara Lindemann et al., Employment Discrimination Law ch. 13.VI.D.1, at 13-114 (5th ed. 2012) (citations omitted). Parker does not dispute that moving her to an adjustable table, either at a different work station or on a different production line, would have amounted to an effective reasonable accommodation for her alleged disability--which, after all, required nothing more than an adjustable table, even on her view of things. Nor does Parker claim that the one-week delay between her request for that accommodation and Accellent's response itself amounted to a violation of § 12112(b)(5)(A). Cf. id. at 13-118 & n.522 (noting that "unnecessary delay in responding to request for reasonable accommodation can [be an] ADA violation"). As a matter of law, then, Accellent did not fail to "mak[e] reasonable accommodations" to Parker's "known physical or mental limitations" under § 12112(b)(5)(A). See Godron v. Hillsborough County, 2000 DNH 077, 2000 WL 1459054, at *2 (D.N.H. Mar. 21, 2000) (Barbadoro, J.) (granting summary

judgment for employer who, in response to employee's request to be reassigned from night shifts to weekend shifts to accommodate his alleged disability, expressed its willingness to assign him temporarily to weekday shifts instead, because "[a]n employee may not maintain an ADA claim if he rejects a reasonable accommodation proposed by his employer").

The same conclusion follows even if, despite the lack of admissible evidence that Parker requested an accommodation for her claimed disability at any point prior to June 6, the court were to assume that, as Parker asserts, she had previously "informed [Accellent] (including [her] supervisors) she needed the table for her . . . qualified disability, and they had known for more than a year." On this account, Accellent had been providing Parker with the adjustable table as an accommodation for her claimed disability until, on June 6, the company replaced the adjustable table with a stationary one; when Parker immediately "reminded" Weber of the status of the adjustable table, he explained that he had forgotten that but would get back to her; one week later, he proposed that, rather than having the adjustable table returned to her work station on the flexible line, Parker could be transferred to the rigid line, where all of the tables were adjustable.

As just discussed, the ADA allows the employer to choose
from among available reasonable accommodations, and "[t]he fact
that [an employer] previously allowed [an employee] to engage in
[an accommodation] does not obligate [it] to continue providing
such an accommodation." Phelps v. Optima Health, Inc., 251 F.3d
21, 26 (1st Cir. 2001).  It follows that, even if Accellent had
previously provided Parker with the adjustable table as an
accommodation, the company would not face liability under the ADA
for removing the table and proposing a different reasonable
accommodation instead.  See Tate v. Shineski, 2010 DNH 036, 18-20
(granting summary judgment for employer who had transferred
employee to a different office without moving the special
furniture she had been provided to accommodate her limited
sitting tolerance, because, after the move, the employer had
accommodated her by letting her avoid prolonged sitting instead).
Accellent is entitled to summary judgment on Parker's claims that
it failed to make a reasonable accommodation for her alleged
disability under both the ADA and its state-law analog.

### 3.   Constructive discharge

For largely the same reasons, Accellent is also entitled to
summary judgment on Parker's claims that, in violation of the ADA
and its state-law analog, the company constructively discharged

24

her on account of her disability.  If motivated by the plaintiff's protected status, "a constructive discharge can ground an employment discrimination claim." Suarez v. Pueblo Int'l, Inc., 229 F.3d 49, 54 (1st Cir. 2000); see also Karch v. BayBank FSB, 147 N.H. 525, 536 (2002).  But "[a] successful constructive discharge claim requires working conditions so intolerable that a reasonable person would have felt compelled to resign . . . .  The standard to meet is an objective one, [and] it cannot be triggered solely by an employee's subjective beliefs, no matter how sincerely held." Gerald v. Univ. of P.R., 707 F.3d 7, 25 (1st Cir. 2013) (quotation marks omitted); see also Lacasse v. Spaulding Youth Ctr., 154 N.H. 246, 248-49 (2006) (setting forth same standard under New Hampshire law).

In the one sentence of her summary judgment memorandum addressing her constructive discharge claims (aside from a lengthy discussion of the facts of Lacasse which does not even attempt to show how they resemble the facts here), Parker states that "the repeated denial to offer the [reasonable accommodation], absent undue business hardship, or another [reasonable accommodation], could lead a jury to determine [she] was constructively discharged."  But there were not "repeated denials," or even one denial, of an accommodation to Parker.

Again, the undisputed facts are that Accellent proposed moving Parker to the flexible line, where all of the tables were adjustable, within one week of when she notified the company that she needed an adjustable table as an accommodation for her claimed disability, but that, after declining reassignment to a different work station on the rigid line, she worked for less than two additional days before taking a brief period of FMLA leave and then quitting (without responding to the company's invitation to fill out the form it used for reasonable accommodation requests).[9]  As this court has noted, "'an employee who leaves his employment when he has been presented with legitimate options for continued employment with that employer . . . is precluded from claiming constructive discharge.'" Slater v. Town of Exeter, 2009 DNH 029, 17-18 (quoting and adding ellipse to Lapointe v. United Autoworkers Local 600, 103 F.3d 485, 489 (6th Cir. 1996)).

In light of Parker's failure to dispute that moving to the adjustable tables of the rigid line was presented to her, or that it was a legitimate option, see Part III.A.1.b, supra, her

_____

[9]Alternatively, if Parker's hearsay account of her prior conversations with Weber is accepted, he had accommodated her with the adjustable table for more than a year, then, on the day the table was replaced, told her he had forgotten about that but that he would get back to her--which he did, one week later, when he proposed moving her to the flexible line.  Those facts also fail to establish constructive discharge as a matter of law.

constructive discharge claim fails as a matter of law, because no jury could find those "working conditions so intolerable that a reasonable person would have felt compelled to resign." Gerald, 707 F.3d at 25 (granting summary judgment against constructive discharge claim arising out of plaintiff's transfer to a new position that merely imposed "some slight . . . inconveniences and costs").  Accellent is entitled to summary judgment on Parker's constructive discharge claims.

### B.   Retaliation

"The ADA, broadly speaking, makes it illegal for employers . . . to retaliate against someone because she opposes an act made unlawful by the ADA." Collazo-Rosado v. Univ. of P.R., 765 F.3d 86, 92 (1st Cir. 2014) (citing 42 U.S.C. § 12203(a)); see also N.H. Rev. Stat. Ann. § 354-A:19.  To make out a claim of retaliation under the ADA, "a plaintiff must show (1) that he engaged in protected conduct, (2) that he suffered an adverse employment action, and (3) that there was a causal connection between the protected conduct and the adverse employment action." Carreras v. Sajo, Garcia & Partners, 596 F.3d 25, 35 (1st Cir. 2010); see also Madeja, 149 N.H. at 379 (applying New Hampshire law).  In support of her retaliation claims, Parker identifies, as her protected conduct, her "multiple requests" for an

accommodation for her claimed disability, and, as the adverse actions, the "final warning for complaining about removal of the table" and Accellent's allegedly "false reports" in opposition to her claim for unemployment benefits.[10]

Accellent does not question that the ADA protects an employee's request that her employer accommodate her disability, see, e.g., Carreras, 596 F.3d at 35-36, nor that giving an employee a formal performance warning is an adverse action, see, e.g., Billings v. Town of Grafton, 515 F.3d 39, 54 (1st Cir. 2008). (While Accellent argues that its response to Parker's unemployment claim was not an adverse action as a matter of law, the court has simply assumed for the sake of argument that it could be.) In moving for summary judgment on Parker's retaliation, Accellent argues principally that no rational jury could find a causal connection between her request for a

---

[10]Parker's submissions also suggested that Accellent had retaliated against her by asking her to recertify her need for FMLA leave in late June 2011, but she clarified at oral argument that this was not part of her retaliation claim. Parker's summary judgment objection also refers, without elaboration, to "changing [her] RA request outright." Insofar this is intended to suggest that Accellent mishandled, or improperly denied, Parker's request for a reasonable accommodation, the court doubts that an employer can be said to have retaliated against an employee for making such a request by denying the request (that conduct would seem to be redressible under the ADA's reasonable accommodation provision, rather than its anti-retaliation provision) but, in any event, no rational jury could find that Accellent denied Parker an accommodation, as already discussed at length. See Part III.A.2, supra.

workplace accommodation and its alleged adverse actions.  The
court agrees.

 To start with, it bears repeating that Parker has not come
forward with admissible evidence that she asked Accellent for an
accommodation until June 6, 2011, during her call to Weber that
followed her discovery that the adjustable table had been
removed.  See Part III.A.2, supra.  Parker points to the fact
that, just one week later, Accellent presented her with the
"corrective performance review" which, she asserts, amounted to a
"warning for complaining about removal of the table."  An
examination of the document itself, however, makes clear that it
did not admonish Parker for opposing the removal of the table,
but for how she went about it:  she "walked off the job without
notifying [Edmonds] on five separate occasions"; she "took it
upon herself to try to get the adjustable table back by
contacting the maintenance supervisor in charge of moving
facility equipment" rather than "work[ing] through proper
channels"; and "she yelled and swore."  Parker makes much of the
statement in the review that she "must accept the decisions made
by management," taking this to mean that she should not have
questioned the removal of the table in the first place, but that
statement is immediately followed by advice on how she "may

question [such] a decision"--setting forth an orderly procedure that she clearly had not followed on June 6.

On any defensible reading, then, the "corrective performance review" does not suggest that Parker was reprimanded for requesting accommodation for her disability, but rather for leaving her work station, attempting to circumvent a managerial decision by enlisting the maintenance staff, and yelling and swearing (and Parker does not dispute having done any of these things.)  Those actions were not protected by the ADA, even if they were sincerely motivated by Parker's desire to see her disability accommodated.  Indeed, "[a]n employer does not violate [federal workplace retaliation law] when it takes adverse employment action against an employee to preserve a workplace environment that is governed by rules, subject to the chain of command, free of commotion, and conducive to the work of the enterprise," because "disruptive or unreasonable protests against discrimination are not protected activity." Matima v. Celli, 228 F.3d 68, 79 (2d Cir. 2000) (citing cases).

So Parker cannot premise her retaliation claim on the "corrective performance review" itself, which, again, simply criticizes her for her disruptive and inappropriate conduct on June 6.  Nor has she come forward with evidence disputing that the review accurately depicted her behavior that day, or

suggesting that she would not have received the warning but for the fact that she had, on that same day, requested an accommodation of her disability.[11]   See Palmquist v. Shinseki, 689 F.3d 66, 74-77 (1st Cir. 2012) (holding that a claim of retaliation under the ADA requires the plaintiff to prove that her protected conduct was the but-for cause of the adverse action).  Finally, there is the fact--undisputed, as already discussed, see Part III.A.2, supra--that, at the very same meeting where they provided her with the corrective performance review, Weber and Morris proposed accommodating Parker's claimed disability.  On this record, no rational jury could find a causal connection between Parker's request for an accommodation--as distinct from the manner in which she communicated it--and the corrective performance review.

The same is true of the other allegedly adverse action, namely, Accellent's telling NHES that Parker had received the corrective performance review for, among other things, "removing proprietary company information from property [sic] [without] authorization."  That was indeed one of the infractions that Accellent had cited in the review itself, see note 5, supra, and, on its face, Morris's email containing this allegedly retaliatory

---

[11]There is no evidence that, for example, other employees who had engaged in similar misconduct but who had not requested accommodations escaped like discipline.

statement merely conveyed the substance of the review--and did so in response to a request from NHES asking her for a rebuttal to a statement from Parker.  Parker has not come forward with any evidence even remotely suggesting that, had she not requested an accommodation for her claimed disability, Morris would not have included the complained-of statement in her response to NHES, which is fatal to her claim that the statement was retaliatory. See Palmquist, 689 F.3d at 77.

Parker's sole attempt to suggest a causal connection, in fact, consists of a single sentence in her summary judgment objection that invokes "temporal proximity," but more than four months passed between Parker's requests for an accommodation during the June 6 call and the June 13 meeting and Morris's email to NHES.  Standing alone--which it is in this case--a gap of this length fails to show a causal connection as a matter of law.  See Calero-Cerezo v. Dep't of Justice, 355 F.3d 6, 25 (1st Cir. 2004) ("Three and four months have been held insufficient to establish a causal connection based on temporal proximity.").  Accellent is entitled to summary judgment on Parker's claims that it retaliated against her for requesting an accommodation.

**C.    FMLA retaliation**

Finally, Accellent is also entitled to summary judgment on Parker's claim that it retaliated against her for taking leave to which she was entitled under the FMLA.  The FMLA expressly makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided" by the Act.  29 U.S.C. § 2615(a).  Thus, "the FMLA prohibits retaliation against employees who take FMLA leave." Pagan-Colon v. Walgreens of San Patricio, Inc., 697 F.3d 1, 8 (1st Cir. 2012).  To make out a prima facie case of FMLA retaliation, an employee must show:  (1) she availed herself of a protected FMLA right; (2) she was adversely affected by an employment decision; and (3) there was causal connection between her protected conduct and the adverse employment action. Carrero-Ojeda v. Autoridad de Energia Electrica, 735 F.3d 711, 719 (1st Cir. 2014).

In moving for summary judgment on Parker's FMLA claim, Accellent argues that "it took no adverse employment action against [her] for taking [FMLA] leave."[12]  The court agrees:  not only does the record contain nothing supporting a causal

---

[12]Parker complains that Accellent has "not developed [its] argument" for summary judgment on the FMLA claim, but it is unclear what else needs to be said of an FMLA retaliation claim presented without any evidence as to when the plaintiff even took FMLA leave.

connection between Parker's FMLA leave and any allegedly adverse
action, it does not even identify the dates of the FMLA leave she
took.  Indeed, the only record evidence on that point is Parker's
testimony that, between March 2008 and June 2011, she took "a
handful of days" of FMLA leave each year.  Without identifying
the dates of her FMLA leave more specifically, Parker cannot hope
to show a causal connection between that leave and any adverse
employment actions which, by her own account, did not even begin
until the "increased" harassment by Edmonds in April 2011.  While
Parker tries to link that behavior to the furlough which
precipitated it, that furlough was, indisputably, not FMLA leave
(Accellent offered it as such, but Parker declined) and therefore
cannot serve as the predicate for an FMLA retaliation claim.  See
Speziale v. Bethlehem Area Sch. Dist., 266 F. Supp. 2d 366, 376
(E.D. Pa. 2003) (granting summary judgment against FMLA
retaliation claim where, "despite possibly qualifying for FMLA
leave, [the plaintiff] did not ask for it").  Accellent's motion
for summary judgment on the FMLA retaliation claim is granted.

IV.  **Conclusion**

For the foregoing reasons, the defendants' motion for
summary judgment[13] is GRANTED.   Parker's motion for an extension
of time to make her final pre-trial filings[13] is DENIED as moot.
The clerk shall enter judgment accordingly and close the case.

**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge

Dated:  November 13, 2014

cc:  Janet R. Barringer, Esq.
     Josiah M. Black, Esq.
     Leslie H. Johnson, Esq.
     Thomas incaid McCraw, Jr., Esq.
     Steven D. Weatherhead, Esq.

---

[13]Document no. 22.

[13]Document no. 36.